# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7486 | **DATE** | 9/8/2003 |
| **CASE TITLE** | | Montgomery vs. Schomig | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Petitioner's petition for writ of habeas corpus is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | SEP 0 9 2003 | | |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | 39 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| TH | ✓ courtroom deputy's initials | U.S. DISTRICT COURT CLERK 03 SEP -8 PM 5:15 FILED FOR DOCKETING Date/time received in central Clerk's Office | date mailed notice | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| United States of America ex rel. )<br>ULECE MONTGOMERY (#A-91082), )<br> )<br>Petitioner, )<br> )<br>v. )<br> )<br>EUGENE McADORY,[1] Warden, )<br>Menard Correctional Center, )<br> )<br>Respondent. )<br>_____ ) | Case No. 01 C 7486<br><br>Hon. Amy St. Eve |

DOCKETED
SEP 0 9 2003

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge:

Before this Court is Ulece Montgomery's petition for writ of habeas corpus pursuant to

28 U.S.C. § 2254, challenging his Illinois conviction for two murders and the trial judge's

imposition of the death penalty. After a careful review of the parties' pleadings, the applicable

authorities and the record, the Court denies the habeas petition in its entirety.

## I.    BACKGROUND

### A.    Procedural Background

In 1983, following a stipulated bench trial in the Circuit Court of Cook County, Illinois,

Montgomery was convicted of murdering two elderly women.[2] Montgomery waived a jury for

---

[1] Montgomery is currently incarcerated at the Menard Correctional Center. Because Eugene
McAdory is the warden at Menard, the Court substitutes McAdory as the proper Respondent. *See* Rule
2(a) of the Rules Governing Habeas Corpus Cases under 28 U.S.C. § 2254; Fed. R. Civ. P. 25(d)(1).

[2] Initially, there was to be a jury trial. On the night after the jury was empaneled, Montgomery
attempted suicide ostensibly because he heard a potential juror say that he could convict Montgomery
simply by looking at him. Due to Montgomery's unavailability in the days that followed, the trial judge
declared a mistrial.

39

sentencing, and the trial judge, Richard Samuels, sentenced him to death. Montgomery appealed to the Illinois Supreme Court raising three claims relating to his conviction, five claims regarding his capital sentencing hearing, and five claims challenging the constitutionality of the Illinois death penalty statute. The Illinois Supreme Court affirmed Montgomery's conviction and sentence. *See People v. Montgomery*, 112 Ill.2d 517 (1986) (*"Montgomery I")*. The United States Supreme Court thereafter denied certiorari. *See Montgomery v. Illinois*, 479 U.S. 1101 (1987).

Later in 1987, Montgomery filed a petition pursuant to the Illinois Post-Conviction Hearing Act raising 32 claims, including a group of claims based on improper *ex parte* meetings between Judge Samuels and his trial attorneys. Specifically, Montgomery claimed that in these meetings Judge Samuels had promised that if Montgomery pleaded guilty and waived a jury for sentencing, the judge would not sentence him to death. Some of Montgomery's Illinois post-conviction claims attacked the alleged actions of Judge Samuels, while others attacked trial counsel for their handling of the case, particularly their *ex parte* communications with the judge.

Montgomery's post-conviction petition was assigned to Judge Samuels, who recused himself. Following reassignment of the case, an evidentiary hearing was held on those claims related to the alleged judicial misconduct. The State prevailed. Montgomery appealed, and the Illinois Supreme Court remanded the case for further evidentiary hearing based on the conclusion that the first post-conviction judge had improperly limited the cross-examination of Judge Samuels and Shirley Thompson, the trial judge's court reporter. *See People v. Montgomery*, 162 Ill.2d 109, 113 (1994) (*"Montgomery II")*.

On remand, a judge from a circuit other than Cook County presided over a new

evidentiary hearing on the claims related to the alleged judicial misconduct, as well as claims of

ineffective assistance of counsel. Once again, the State prevailed. Montgomery appealed, and,

on June 15, 2000, the Illinois Supreme Court affirmed the denial of post-conviction relief. *See*

*People v. Montgomery*, 192 Ill.2d 642 (2000) ("*Montgomery III*"). On October 2, 2000, the

Illinois Supreme Court denied Montgomery's petition for rehearing. The United States Supreme

Court denied certiorari on June 4, 2001. *See Montgomery v. Illinois*, 532 U.S. 1068 (2001).

On September 27, 2001, Montgomery filed his petition for a writ of habeas corpus with

this Court.[3] After Respondent filed an Answer and Montgomery filed a Traverse to the Answer,

former Illinois Governor George Ryan commuted Montgomery's death sentence to a sentence of

natural life imprisonment. On June 24, 2003, this Court dismissed as moot the 19 claims that

exclusively involved the death penalty and three non-sentencing claims premised on

Montgomery's death sentence. The Court also found that of the remaining claims, the portions

of them which dealt with the death penalty, as opposed to Montgomery's conviction, also are

moot.

## B.    Evidentiary Record

Montgomery does not challenge the facts set forth in the Illinois Supreme Court's opinion

on the direct appeal of his conviction and sentence. *See Montgomery I.* Thus, those facts are

presumed correct for purposes of the Court's collateral review. *See* 28 U.S.C. § 2254(e)(1);

*Collier v. Davis*, 301 F.3d 843, 848 (7th Cir. 2002). Montgomery, however, disputes some of the

---

[3] Originally, this case was assigned to the Honorable Charles Norgle, Sr. and was reassigned to
this Court on August 30, 2002.

3

factual determinations set forth in *Montgomery III*. The Court addresses these specific challenges below.

### 1.    Evidence Presented at the Pre-Trial Hearing and Trial

The evidence adduced at the pre-trial suppression hearing and stipulated bench trial indicate that two elderly women were found raped and strangled in their apartments in a two-flat building which they owned. There was blood on the women's bodies coming from each victim's nose and mouth. In addition, there was no sign of forced entry into either apartment.

After police arrived to investigate the homicides, Montgomery walked his bicycle to the scene and asked the police what was happening. In response to an officer's inquiry, Montgomery indicated that he lived in a coach-house apartment behind the victims' two-flat on the same lot. Police noticed scrapes on Montgomery's hands and spatters of blood on his pants. When asked about the blood and scrapes, Montgomery stated that he had cut himself while attempting to repair his bicycle. Montgomery then went with the police to the police station. While there, he signed a written consent form allowing the police to take his finger and palm prints, samples of his head and pubic hair, pubic hair combings, and fingernail scrapings. The police also confiscated Montgomery's blood-spattered clothing before releasing him.

Two days later, a police officer received word that Montgomery's finger and palm prints matched latent prints found on one victim's eyeglasses and on an eyeglass case found in that victim's apartment. Police then arrested Montgomery, who, when confronted with information regarding the fingerprint match, made the first of three confessions indicating that he had raped and strangled both women.

4

## 2.    Evidence Presented at the Second Post-Conviction Hearing

On appeal from the second post-conviction hearing, the Illinois Supreme Court focused

on the evidence pertaining to two discrete issues: (1) whether the judge who had presided at trial

and sentencing had assured defense counsel that Montgomery would not receive the death

penalty if he waived a jury and pleaded guilty; and (2) whether trial counsel had been ineffective

at the capital sentencing hearing. Montgomery's claims pertaining to his capital sentencing

hearing have been rendered moot by the commutation of his death sentence. Thus, the Court

turns to the evidence bearing on the first issue.

At the second evidentiary hearing, John McNamara testified that he was lead counsel in

Montgomery's case. McNamara stated that in April of 1983, he went to the courthouse to inform

Judge Samuels that the court would not have to hold a fitness hearing because a psychiatric

report made after Montgomery's suicide attempt showed that Montgomery was fit to stand trial.

McNamara indicated that he told Judge Samuels what evidence the defense planned to present at

trial and sentencing. In response, McNamara said that Judge Samuels suggested Montgomery

should probably plead guilty. McNamara replied that he could not advise Montgomery to do so

absent a commitment from the judge that the death penalty would not be imposed. According to

McNamara, Judge Samuels responded by saying "look at my record." McNamara construed the

comment to mean that if Montgomery waived a jury for sentencing, Judge Samuels would not

impose the death penalty. McNamara testified that he discussed that conversation with Paul

Foxgrover, who at that time was an assistant public defender who previously had appeared before

Judge Samuels. Foxgrover assured McNamara that he could rely on Judge Samuels'

representations. Later, McNamara testified that he thought it was the policy of the Public

Defender's homicide task force not to waive a jury for sentencing absent an indication that the judge would not impose the death penalty.

Further, McNamara testified that he told his co-counsel, Michael Morrissey, about his conversation with Judge Samuels and Morrissey responded that he, too, had a conversation with Judge Samuels in which the judge indicated that he would sentence Montgomery to natural life imprisonment if he pleaded guilty. McNamara also testified that he had spoken to Judge Samuels' court clerk, Moses Cole, about the case. He stated that Cole approached him and told him that Montgomery should opt for a bench sentencing hearing because he did not believe that the judge would impose the death penalty. McNamara testified to a similar conversation with Shirley Thompson, the court reporter assigned to Judge Samuels' courtroom.

Next, co-defense counsel Morrissey testified to having a similar *ex parte* conversation with Judge Samuels in late April of 1983. Like McNamara, Morrissey testified that it was office policy not to waive a sentencing jury absent a clear indication from the judge that the death penalty would not be imposed. Morrissey indicated that Judge Samuels encouraged him to have Montgomery plead guilty and stated that he would impose a life sentence. Morrissey stated that he told both his office partner, Andrea Lyon, and McNamara about the conversation with Judge Samuels. Lyon testified at the hearing that Morrissey had mentioned the conversation to her and that Morrissey had telephoned her after the sentencing hearing to complain that Judge Samuels had reneged on his promise.

Both McNamara and Morrissey testified to another *ex parte* meeting with Judge Samuels just before the scheduled trial date. They testified that they spoke with the judge about their intent to have a stipulated bench trial and waive a jury for sentencing to determine if the judge

6

would agree with their interpretation of the judge's promise not to impose the death penalty. Both said that the judge gave no indication that he would not honor what they thought was the judge's prior commitment. According to McNamara and Morrissey, the conversation ended when the lead prosecutor burst into the judge's chambers and yelled that it was improper for McNamara and Morrissey to discuss the case with the judge behind the prosecutor's back. The prosecutor then abruptly left the judge's chambers.

The hearing testimony further indicated that after the sentencing hearing McNamara and Morrissey visited Robert Isaacson, a supervising appellate public defender, to discuss Montgomery's death sentence despite the judge's alleged promise. The three concluded that they would not confront Judge Samuels directly with the issue. Instead, they decided to refer to the problem indirectly in Montgomery's post-trial motion. At the hearing on that motion, Judge Samuels did not grant Montgomery relief or refer to the alleged promise.

Judge Samuels testified at the second post-conviction hearing as well. He stated that he had an open door policy and encouraged attorneys to converse with him in chambers. The judge acknowledged that it was possible, if not probable, that he had met in chambers with McNamara and Morrissey, but denied making any promises regarding Montgomery's case. Rather, the judge testified that he would have limited any conversations he may have had with McNamara or Morrissey to the scheduling of the case. Further, Judge Samuels denied discussing cases with his staff or encouraging them to approach McNamara regarding Montgomery's case. Finally, Judge Samuels acknowledged meeting with Montgomery's attorneys immediately before trial.

The judge's court reporter, Thompson, testified that Judge Samuels would meet alone with attorneys and that the judge did not talk to her about specific cases. She also testified that

she did not advise McNamara about possible sentences for Montgomery or tell counsel that the judge would not impose the death penalty if Montgomery pleaded guilty or waived a jury. At the time of the second evidentiary hearing on post-conviction review, the judge's former court clerk, Moses Cole, was no longer living. The parties did stipulate, however, to the days Cole was present at work during 1983. According to this stipulation, Cole did not work on the day that McNamara stated Cole had approached him about Montgomery's sentence.

At the end of the evidentiary hearing, the post-conviction judge concluded that the evidence did not support the allegation that Judge Samuels had improper *ex parte* discussions with defense attorneys, nor that Judge Samuels had made any promises to Montgomery's attorneys. On post-conviction appeal, the Illinois Supreme Court articulated: "The parties agree that this was essentially a credibility question, and we believe that it is appropriate here to defer to the judge who presided at the defendant's post-conviction hearing, who was in a superior position to gauge the witnesses' credibility and to evaluate the sharply conflicting testimony." *See Montgomery III,* 192 Ill.2d at 663. The Illinois Supreme Court further explained that the corroborating witnesses at the hearing could only testify as to what Montgomery's defense lawyers believed they had heard from Judge Samuels. *See id.* In addition, the Illinois Supreme Court noted that McNamara's testimony was contradicted by other evidence, and that Foxgrover was impeached by his prior convictions. *See id.* at 664. Deferring to the trial judge's credibility determinations, the Illinois Supreme Court concluded that the trial court's findings were not against the manifest weight of the evidence as Montgomery claimed. *See id.* at 663-64.

### 3.    Challenge to Factual Determinations

Montgomery challenges the Illinois Supreme Court's factual findings regarding the *ex parte* communications.  Montgomery has a high burden to meet in this regard, because he is required to provide clear and convincing evidence to rebut the presumptive correctness of the Illinois Supreme Court's factual findings.  *See* 28 U.S.C. § 2254(e)(1); *Collier*, 301 F.3d at 848.  This presumption of correctness is of particular importance when a federal habeas court reviews a state court's credibility determinations.  *See Murrell v. Frank,* 332 F.3d 1102, 1112 (7th Cir. 2003); *Cf. Miller-El v. Cockrell,* 123 S.Ct. 1029, 1040-41 (2003) (application for a certificate of appealability).  As explained below, Montgomery has not met his burden.

Montgomery contends that the Illinois Supreme Court improperly expressed doubt that the *ex parte* meetings actually occurred.  Specifically, Montgomery challenges the Illinois Supreme Court's factual determination that:  "If any conversations occurred, it appears they were limited to matters of scheduling."  *See Montgomery III,* 192 Ill.2d at 666.  Montgomery also challenges the Illinois court's statement that the *ex parte* communications were "supposed communications."  *See id.*  Thus, Montgomery argues, the Illinois Supreme Court erred by omitting reference to Judge Samuels' testimony about the *ex parte* meetings.  Montgomery then asserts that based on the record, the only reasonable conclusion is that Judge Samuels promised Montgomery's defense counsel that he would not sentence Montgomery to death if he stipulated to the State's case and waived a jury for sentencing.

Montgomery's claim that the Illinois Supreme Court erred by omitting reference to Judge Samuels' testimony misrepresents the Illinois court's factual findings.  Indeed, the Illinois court discussed Judge Samuels' testimony at the evidentiary hearing in detail, including his testimony

that he participated in a meeting with Montgomery's attorneys before trial and that "he probably met with one or another of the defense lawyers to discuss scheduling matters." *See id.* at 660.

Nonetheless, Montgomery overstates the strength of his case by outlining the post-conviction hearing evidence to support his conclusion that Judge Samuels promised not to sentence him to death. Reiterating the hearing testimony alone does not rebut the presumptive correctness of the Illinois Supreme Court's factual findings by clear and convincing evidence, especially in light of this Court's deference to the Illinois courts' credibility determinations. *See Murrell,* 332 F.3d at 1112. Instead, Montgomery's determination that the only reasonable conclusion is that Judge Samuels promised not to sentence him to death is mere speculation and does not establish by clear and convincing evidence that the Illinois Supreme Court's factual findings were in error.[4] *See* § 2254(e)(1). Accordingly, the Court adopts the factual determinations as set forth in *Montgomery III.*

## II.  HABEAS STANDARD

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petitioner is not entitled to a writ of habeas corpus unless the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor,* 529 U.S. 362, 404-05 (2000). In *Williams,* the Supreme Court explained that a state

---

[4] Because the Court concludes that Montgomery did not establish by clear and convincing evidence that the Illinois Supreme Court erred in its factual determinations, the Court need not address Montgomery's cursory argument that the Illinois court's decision was based on "an unreasonable determination of the facts in light of the evidence presented" under Section 2254(d)(1). *See Ward v. Sternes,* 334 F.3d 696, 703-04 (7th Cir. 2003) (petitioner must establish that state court committed unreasonable error).

court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives

at a conclusion opposite to that reached by this Court on a question of law" or "if the state court

confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and

arrives at a result opposite to ours." *See id.* at 405.

Under the "unreasonable application" prong under Section 2254(d)(1), a habeas petitioner

must demonstrate that although the state court identified the correct legal rule, it unreasonably

applied the controlling law to the facts of the case. *See id.* at 407. A state court's application of

Supreme Court precedent is unreasonable if the court's decision was "objectively" unreasonable.

*See Lockyer v. Andrade,* 123 S.Ct. 1166, 1174 (2003) (unreasonable application more than

incorrect or erroneous). In order to be considered unreasonable under this standard, a state

court's decision must lie "well outside the boundaries of permissible differences of opinion."

*See Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002); *see also Searcy v. Jaimet,* 332 F.3d

1081, 1089 (7th Cir. 2003) (reasonable state court decision must be minimally consistent with the

facts and circumstances of the case).

## III.    MONTGOMERY'S REMAINING HABEAS CLAIMS

Originally, Montgomery raised 29 claims in his habeas petition, many challenging the

death penalty in general and his death penalty hearing exclusively, some challenging only the

guilt and innocence phase of his trial, and the remainder challenging both the trial and the death

penalty. Because of the former governor's commutation of Montgomery's death sentence, this

Court already concluded that many of Montgomery's habeas claims are moot. Montgomery's

remaining claims -- claims 1-6 and 11 -- are viable only to the extent that they challenge his

conviction and not his commuted death sentence.

## A.     Judicial Misconduct

Montgomery raises three judicial misconduct claims based on the *ex parte* meetings between his attorneys and Judge Samuels.  In his first claim, Montgomery contends that Judge Samuels improperly induced him to waive his right to a jury and present a defense due to the promises made during the *ex parte* communications.  Second, Montgomery argues that Judge Samuels' participation in the *ex parte* conversations violated his right to due process.  Last, Montgomery claims that Judge Samuels deprived him of due process by initiating plea discussions.

A criminal defendant has a constitutional right to be tried before a fair and impartial judge. *Bracy v. Gramley,* 520 U.S. 899, 904-05 (1997).  The due process clause "requires that a defendant receive a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Id.* (citations omitted).  In reviewing a judicial bias claim, the Court presumes that the trial judge properly discharged his official duties. *See id.* at 909; *see also Aleman v. Honorable Judges of Circuit Court of Cook County,* 138 F.3d 302, 307 (7th Cir. 1998) (judges presumed impartial, but presumption can be rebutted by specific facts of judicial impropriety).

### 1.     Jury Waiver and Right to Present a Defense

First, Montgomery contends that Judge Samuels improperly induced him to waive his right to a jury and present a defense due to the promises made during the *ex parte* meetings.  This judicial misconduct claim presupposes that Judge Samuels actually made the promise that he would not impose the death penalty.  The Court, however, has accepted the Illinois Supreme Court's findings of facts to the contrary.  Even assuming that Judge Samuels made such a

12

promise, Montgomery has not set forth evidence that establishes a nexus between the judge's promise and his decision to waive a jury trial.

Moreover, in the course of the stipulated bench trial, Judge Samuels gave Montgomery the warnings normally given defendants who plead guilty pursuant to Illinois Supreme Court Rule 402. Montgomery's responses to these warnings indicated that he had been promised nothing and that his actions were voluntary. As such, Montgomery has not overcome the presumption that Judge Samuels was impartial or that Judge Samuels had an actual bias against him or an interest in the outcome of his case. *See Bracy,* 520 U.S. at 904-05, 909. Therefore, the Court denies the first judicial misconduct claim.

### 2. Judge's Participation in *Ex Parte* Communications[5]

Second, Montgomery contends that Judge Samuels' participation in the *ex parte* meetings was improper, regardless of the content of the discussions, and thus, tainted the proceedings and prejudiced Montgomery in violation of his right to due process. Specifically, Montgomery argues that due to the prosecutor's knowledge of the judge's conversation with defense counsel, Judge Samuels had "an improper, but strong incentive to sentence Montgomery to death to avoid any allegations of misconduct." Montgomery elaborates that being caught by the prosecutor on the eve of trial "fostered in Judge Samuels an interest in the outcome of Montgomery's case arising from the strong personal need to protect his reputation against a charge of unethical conduct."

---

[5] Under this claim, Montgomery seeks a new sentencing hearing. Because he has been convicted of two murders, Montgomery's sentence of natural life imprisonment is the lowest possible sentence he can serve. *See* 730 ILCS 5/5-8-1(a)(1)(c)(ii); *People v. McCoy,* 337 Ill.App.3d 518, 520-21 (Ill.App.Ct. 2003) (multiple murder statute proscribes mandatory life term for conviction of more than one murder).

Montgomery has not supported this very speculative argument with concrete facts and evidence as required to rebut the presumption that Judge Samuels was impartial. *See Bracy,* 520 U.S. at 909; *Aleman,* 138 F.3d at 307. In addition, based on Montgomery's unsubstantiated version of the events, he has not established that Judge Samuels had actual bias against him or an interest in the outcome of his particular case. *See Bracy,* 520 U.S. at 904-05.

Further, Montgomery argues that Judge Samuels' participation in the *ex parte* meetings violated Illinois Supreme Court Rule 61 because it created the appearance of impropriety. Federal habeas courts, however, are limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254(a). .Here, Montgomery's claim relies on a state court rule of judicial conduct, not a constitutional right. This argument, therefore, is not cognizable on habeas review. *See Dellinger v. Bowen,* 301 F.3d 758, 764 (7th Cir. 2002). As such, the Court denies this claim.

### 3.    Improper Plea Discussions

In his third habeas claim, Montgomery contends that this Court should overturn his conviction and sentence because Judge Samuels improperly initiated plea discussions. Citing a Southern District of New York case, Montgomery argues that plea discussions initiated by the court are inherently coercive. *See Elksnis v. Gilligan,* 256 F. Supp. 244, 254 (S.D.N.Y. 1966) ("A plea entered upon a bargain agreement between a judge and an accused cannot be squared with due process requirements of the Fourteenth Amendment"). Montgomery also relies on Rule 11 of the Federal Rules of Criminal Procedure and the American Bar Association ("ABA") Standards for Criminal Justice in support of his argument.

Once again, this argument presupposes that Judge Samuels initiated plea discussions in the first place, a factual premise the Court has rejected. Further, Montgomery has not developed an argument based on clearly established Supreme Court precedent as required under the AEDPA.[6] *See* § 2254(d)(1); *Williams*, 529 U.S. at 404-05. Finally, Montgomery asserts that by initiating plea discussions with Montgomery's attorneys, Judge Samuels violated Illinois Supreme Court Rule 402. Because this argument is based on state law, it is not cognizable on habeas review. *See Dellinger*, 301 F.3d at 764.

Accordingly, Montgomery's three judicial misconduct claims based on the *ex parte* discussions must fail. To conclude otherwise would be "incompatible with Section 2254(d)(1)'s highly deferential standard under Section 2254(d)(1), which demands that state-court decisions be given the benefit of the doubt." *See Woodford v. Visciotti*, 537 U.S. 19, 24 (2003) (per curiam) (citation and quotation omitted).

## B.    Ineffective Assistance of Trial Counsel

In habeas claims four and five, Montgomery contends that the Illinois Supreme Court's decision that trial counsel was not constitutionally ineffective for advising him to stipulate to the State's case and waive his right to a jury was both "contrary to" and an "unreasonable application" of clearly established Supreme Court precedent under Section 2254(d)(1). In claim six, Montgomery argues that he was denied constitutionally effective assistance of trial counsel because his attorneys failed to take the necessary steps to insure his competency to waive a jury. Montgomery makes no argument as to whether the Illinois Supreme Court's decision as to this

---

[6] The Court will not construct Montgomery's argument for him. *See Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996) (court has no duty to construct litigant's legal arguments, especially when party represented by counsel).

15

claim was an "unreasonable application" of or "contrary to" clearly established Supreme Court precedent as required under the AEDPA. *See* § 2254(d)(1); *Williams*, 529 U.S. at 404-05.

To render constitutionally effective assistance of counsel under the Sixth Amendment, counsel's performance must satisfy the familiar two-prong standard in *Strickland v. Washington*, 466 U.S. 668, 687-91 (1984). Under the *Strickland* performance prong, Montgomery must show that his counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-88. A "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and quotations omitted).

Under the *Strickland* prejudice prong, Montgomery must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* If a defendant fails to make a proper showing under one of the *Strickland* prongs, the court need not consider the other prong. *See Strickland*, 466 U.S. at 697.

### 1. Advice to Stipulate to State's Case and Waive Jury

Claims four and five may be viewed together. In general, Montgomery argues that his trial counsel rendered ineffective assistance to the extent that they relied on the purported promises made by Judge Samuels not to impose the death penalty, which, in turn, caused them to give Montgomery the erroneous advice to stipulate to the State's case and waive his right to a jury. In analyzing these claims, the Illinois Supreme Court concluded that there were other

16

reasons supporting counsel's decision to advise Montgomery to waive a jury, including a

prospective juror's comment that he could decide Montgomery's guilt just by looking at him, and

that judges are less likely to impose the death penalty than a jury. *See Montgomery III,* 192 Ill.2d

at 665-66. Montgomery contends that the Illinois Supreme Court's conclusion is not based on

the record, and thus "contrary to" and an "unreasonable application" of the *Strickland*

performance prong.

In support of his argument, Montgomery contends that the only possible conclusion from

the record is that the *ex parte* meetings with Judge Samuels caused counsel to advise him to enter

into a plea agreement and bench sentencing hearing. Once again, Montgomery relies on his

interpretation of the factual findings that promises were made during these *ex parte* meetings, not

the Illinois Supreme Court's findings that the Court presumes are correct. In addition,

Montgomery does not support his contention by establishing with clear and convincing evidence

that there was a nexus between the *ex parte* discussions and his counsel's advice. *See*

§ 2254(e)(1); *Collier,* 301 F.3d at 848. Without more, Montgomery's argument that the Illinois

court's decision was "contrary to" *Strickland* has no merit.

Although Montgomery states that the Illinois Supreme Court's decision was an

unreasonable application of the *Strickland* performance prong, he makes no argument as to why

the Illinois court's decision was objectively unreasonable. *See Andrade,* 123 S.Ct. at 1174.

Therefore, he has failed to demonstrate that the Illinois Supreme Court's decision was an

unreasonable application of *Strickland* as required under the AEDPA. *See Woodford,* 537 U.S. at

24-25 (petitioner has burden in establishing state court applied facts of case in an objectively

unreasonable manner); *see also Lechner v. Frank,* ___ F.3d ___, ___ (2003 WL 21999019 at *1

(7th Cir. 2003) (habeas petitioner bears burden of showing state court rejected constitutional challenges in manner that was "contrary to" or involved an "unreasonable application" of clearly established Supreme Court law).

Next, Montgomery claims that the *Strickland* prejudice prong may be presumed because his counsel failed "to subject the prosecution's case to meaningful adversarial testing." *See United States v. Cronic,* 466 U.S. 648, 659 (1984). Recently, the United States Supreme Court emphasized that a *Cronic* analysis is applicable only if the attorney's failure is complete, that is, only when counsel abandons the defendant. *See Bell v. Cone*, 535 U.S. 685, 696-97 (2002); *see also United States v. Hodges*, 259 F.3d 655, 659 (7th Cir. 2001) ("In an abandonment claim, prejudice is presumed"). Montgomery argues that when he stipulated to the State's case, the adversarial process broke down and the prosecution's case was not tested at all. Montgomery, however, does not specify what acts or omissions constitute counsel's abandonment. Without a more comprehensive argument outlining credible evidence in support of his argument, Montgomery's *Cronic* claim fails. *See Hodges,* 259 F.3d at 659 (unsupported allegations inadequate to establish *Cronic* claim).

In the alternative, Montgomery argues that the evidence unambiguously supports the conclusion that he was prejudiced by his counsel's performance under *Strickland*.[7] Montgomery, however, merely makes additional arguments as to counsel's performance, including the argument that counsel pressured him into waiving a jury. Nevertheless, Montgomery would be hard-pressed to establish prejudice due to the commutation of his death sentence because under

---

[7] As Montgomery correctly notes, the Illinois Supreme Court did not address the *Strickland* prejudice prong and was not required to do so. *See Strickland v. Washington*, 466 U.S. 668, 697 (1984) (if defendant fails to make showing under one *Strickland* prong, court need not decide other prong).

Illinois law, natural life imprisonment is the lowest possible sentence he could receive based on

his conviction for the murders of the two elderly women. *See* 730 ILCS 5/5-8-1(a)(1)(c)(ii);

*People v. McCoy,* 337 Ill.App.3d 518, 520-21 (Ill.App.Ct. 2003) (multiple murder statute

proscribes mandatory life term for conviction of more than one murder).

Because *Strickland* is a balancing test rather than a bright-line rule, only clear error in

applying *Strickland* supports a writ of habeas corpus. *See Murrell,* 332 F.3d at 1111. The Court

concludes that Montgomery has not established that the Illinois Supreme Court committed clear

error in applying *Strickland* to his fourth and fifth habeas claims, and therefore, denies them.

### 2.    Competency to Waive Jury

Next, Montgomery contends that his trial counsel was constitutionally ineffective because

they failed to take the necessary steps to insure his competency to waive a jury due to his earlier

suicide attempt. When analyzing this claim, the Illinois Supreme Court explained:

> A psychiatric examination of the defendant after his suicide attempt found
> him to be fit, however. In addition, the proceedings at trial show that the
> defendant made knowing, intelligent, and voluntary waivers of juries, both before
> trial and before sentencing. The trial judge admonished the defendant of his
> rights, and the defendant agreed to give them up. Also, the record shows that the
> defendant knowingly, intelligently, and voluntarily agreed to the submission of the
> case to the trial judge through a stipulated bench trial. On each occasion, the
> defendant denied that he had been promised anything in exchange.

*Montgomery III,* 192 Ill.2d at 681.

The Court concludes that the Illinois Supreme Court's decision is consistent with the

facts and circumstances of the case, and thus an objectively reasonable application of *Strickland.*

*See Searcy,* 332 F.3d at 1089. The Illinois court based its conclusion on a psychiatric

examination finding Montgomery fit to stand trial and Montgomery's knowing and intelligent

waivers. Montgomery makes no argument refuting the Illinois court's conclusion, thereby failing to establish that the Illinois Supreme Court rejected his *Strickland* challenges in a manner that was either "contrary to" or involved an "unreasonable application" of clearly established Supreme Court law. *See Lechner,* ___ F.3d at ___, 2003 WL 21999019 at *1. Accordingly, the Court denies Montgomery's ineffective assistance of counsel claim based on his competency to stand trial.

### C.    Ineffective Assistance of Appellate Counsel

Finally, Montgomery asserts that his appellate counsel rendered ineffective assistance by failing to argue that the trial court improperly allowed a stipulated bench trial and bench sentencing hearing without first ensuring that his waivers were knowing and voluntary. *Strickland* provides the appropriate standard for reviewing claims of ineffective appellate counsel. *See Williams,* 529 U.S. at 390-91. Under the first *Strickland* prong, an appellate counsel's performance is deficient if counsel fails to appeal any issue that is both obvious and clearly stronger than the ones raised. *See Winters v. Miller*, 274 F.3d 1161, 1167 (7th Cir. 2001). To establish the requisite prejudice under the second *Strickland* prong, a petitioner must show that appellate counsel's failure to raise an issue may have resulted in the reversal of his conviction or an order for a new trial. *See id.*

Here, the Illinois Supreme Court concluded that based on its rejection of similar challenges to trial counsel's performance, Montgomery's appellate counsel claim must also fail. *See Montgomery III,* 192 Ill.2d at 682. Montgomery does not argue, let alone establish, that his appellate counsel's performance was deficient and that counsel's failure to raise this issue may have resulted in the reversal of his conviction or an order for a new trial. *See Winters*, 274 F.3d

at 1167. More importantly, Montgomery does not address the Illinois Supreme Court's decision at all. He thus fails in his burden of establishing that the Illinois court rejected his appellate counsel claim in a way that was "contrary to" or an "unreasonable application" of clearly established Supreme Court law. *See Lechner*, ___ F.3d at ___, 2003 WL 21999019 at *1. Therefore, the Court denies Montgomery's ineffective assistance of appellate counsel claim.

## CONCLUSION

For the foregoing reasons, the Court denies Montgomery's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [R. 1].


DATED:  September 8, 2003                    ENTERED

                                             AMY J. ST. EVE
                                             United States District Court Judge